Argued October 2, 1918, reargued February 7, reversed and remanded March 25, 1919.

## STATE *v.* COX.

(179 Pac. 575.)

**Intoxicating Liquors—Unlawful Possession.**

1. In a prosecution under Laws of 1915, Chapter 141, Section 5, as amended by Laws of 1917, Chapter 40, Section 1, making it unlawful for any person to possess intoxicating liquor within the state, it is not sufficient that the defendant hotel porter received as baggage of an incoming guest a suitcase, which he had no right to inspect and which contained liquor, but he must have had guilty knowledge or intent.

**Intoxicating Liquors—Wrongful Possession—Evidence—Question for Jury.**

2. In a prosecution of a hotel porter for having in his possession, while transporting to the hotel, baggage containing whisky, it was a question of fact for the jury to find from the evidence beyond a reasonable doubt whether the defendant knew or had reasonable ground to know or believe that the suitcase contained intoxicating liquor when taking it into his possession.

BURNETT, BEAN, and BENSON, JJ., dissenting.

[What liquors are deemed to be intoxicating, see note in 53 Am. Rep. 86.]

From Jackson: FRANK M. CALKINS, Judge.

In Banc.

A criminal complaint was filed against the defendant in the Justice's Court of Medford District for Jackson County, in which it was charged:

"That the said H. Cox on the 7th day of February, 1918, in said County of Jackson, and State of Oregon, then and there being, did then and there unlawfully and wrongfully possess intoxicating liquor, to wit: 12 quarts of whisky, contained in 12 quart bottles. * * "

Whereupon he was tried and convicted and sentenced to pay a fine of $200 and to be imprisoned in the county jail for the term of three months. From this judgment he appealed to the Circuit Court, where he was again tried and convicted, and was sentenced to pay a fine of $100 and to be confined in the county jail for the period of forty-five days, from which judgment he appeals to this court. The prosecution is based upon Section 5, Chapter 141, Laws of 1915, as amended by Section 1 of Chapter 40, Laws of 1917, which reads as follows:

"Except as hereinafter provided in this amendatory Act, it shall be unlawful for any person to receive, import, possess, transport, deliver, manufacture, sell, give away or barter any intoxicating liquor within this state. * * " .

The case comes to this court on a bill of exceptions only, from which it appears

"without contradiction that the defendant at the time of the alleged commission of the crime set forth in the indictment, was a porter in the employ of the Medford Hotel;

"That it was his duty in the regular course of his employment, to meet the incoming railway trains at Medford and receive the baggage of guests to the Hotel arriving on such trains, and to transport the same to the Hotel there to be claimed by such guests; that the manner in which such baggage was transported by defendant was substantially as follows: Defendant would receive the baggage from the guests or railway porters at the trains, would transfer it to the

bus operated by another employee of the Hotel, and would then ride on this bus in charge of the baggage to the Hotel where he would transfer it into the lobby of the Hotel.

"The State further produced evidence tending to prove and sufficient, if believed by the jury, to establish that the defendant met the train arriving in Medford from California on the evening of February 7, 1918, that on this occasion defendant received from one of the sleeping-car porters on the train a suit case containing twelve quarts of whisky; that defendant knew and had informed others that the whisky was to arrive on the train in question and that the suit case contained whisky and that it was the property of defendant and that defendant received it on his own account as his own property and not merely in his capacity as a porter of the Hotel. The evidence of the State further proved that the defendant took the suit case and was in the act of transporting it together with other baggage to the Hotel in the usual manner, when he was arrested and the suit case taken into possession by the officers.

"The defendant offered evidence tending to prove, and which if believed by the Jury was sufficient to establish that he received the suit case in question, from the porter of the sleeping-car in the same manner and under the same conditions that he often received baggage belonging to incoming guests of the Hotel from such porters, and that at the time of so receiving it he received it as the baggage of an incoming guest believing it to be such, and that he had no property interest whatever in the suit case or contents, and no knowledge or suspicion that such contents were intoxicating liquor, and that the only possession or control he ever had of the suit case or its contents consisted in his receiving it in his capacity of porter as aforesaid as the baggage of an incoming guest of the Hotel and transporting it in the manner above set forth, from the railway station to the Hotel. This testimony consisted exclusively of the evidence of the defendant."

In the first instance the court duly instructed the jury in the presence of counsel and no exceptions were taken to the charge. After some deliberation the jury returned into court for further instructions, and it appears from the bill of exceptions that:

"The jury was recalled by the Court, who in the absence of the District Attorney, of the defendant and of the defendant's attorney, all of whom had on the retiring of the jury, left Court and gone to Medford, five miles away, gave the following additional instructions:

"Juror: We want to know, your Honor, if he is proved in possession of the article, is the burden of proof upon him to show his innocence or not?

"By the Court: Yes.

"By the Juror: It is?

"By the Court: Yes. In other words, it is the law that anyone possessing whisky that he did not have in his possession prior to February, 1917, is violating the law.

"By the Juror: That is, under the prohibition law?

"By the Court: Yes, I will say to you, that there is a distinction between laws of this kind and laws in regard to crime that is a crime in itself. The law makes a distinction between a crime that is a crime in itself, and a crime that is a crime because the law makes it so. I will give you an example of a crime that is a crime in itself; murder or robbery; a crime that is a crime because the law makes it so, is one violating the prohibition law or killing deer out of season, or catching fish without a license. Unless there is some law on the subject it is no crime to carry intoxicating liquor, you see the distinction between the two crimes.

"By the Juror: Yes.

"By the Court: Now in the case of crime, which is a crime in itself, like murder or robbery, there must be an intent. In a case where it is a crime because the law makes it so, intent is not necessary. So this is one of the kind where the intent is not a necessary in-

gredient of the crime, and the law absolutely prohibits intoxicating liquor in his possession.

"By the Juror: Whether he knows of its contents or not?

"By the Court: That is the law.

"By the Juror: Your Honor, the law is, that the railroad company or any carrier, must know what they carry, is it not?

"By the Court: Yes.

"By the Juror: If they carry something, and do not know what is in it, they must prove that they are innocent, and do not intend to do it?

"By the Court: Yes. We have a case that went to the Supreme Court from Oregon City, from Clackamas County, where a man was running one of these dance houses, by the name of Wilbur, or the Friars Club, as perhaps you have seen in the paper, and one of his waiters sold liquor. He claimed that they could not convict him, that is the proprietor, without showing that he knew about it, and the Supreme Court held that the fact that the man that was working for him was guilty of the crime was sufficient, and he was held guilty by both the lower Court and the Supreme Court.

"By the Juror: Well, what would constitute possession necessarily, say, in regard to a suit case like that?

"By the Court: Having it in his possession.

"By the Juror: Well, but lifting it off the ground, we will say?

"By the Court: That is the law, I am here to instruct you on the law, I cannot tell you anything further.

"Jury retires with the bailiff.

"Thereafter the Court duly allowed the defendant the following exceptions to that portion of the foregoing charge given in his absence and in the absence of his counsel:

"The defendant excepts to that portion of the charge given to the jury wherein the Court instructed the jury that under the circumstances disclosed by the evidence in this case, the defendant might be guilty of the crime charged in the indictment even though he had no in-

tention of committing said crime. (In so far as the instructions so state.)

"The defendant excepts to that portion of the foregoing charge wherein the Court instructed the jury that the defendant might be guilty under the circumstances disclosed by the evidence in this case even though he had no interest therein, merely because he lifted the suit case off the ground and transported it as a porter of the Hotel. (In so far as the instructions so state.)"

In his brief defendant's counsel did not claim any error by the court in giving its instructions during his absence; hence the only question presented by the record is whether or not the court committed error in the charge as given to the jury, to which exceptions were duly taken by defendant's counsel.

REVERSED AND REMANDED.

For appellant there was a brief and an oral argument by *Mr. Porter J. Neff.*

For the state there was a brief and an oral argument by *Mr. George M. Roberts,* District Attorney.

JOHNS, J. -1. Eliminating all words unnecessary to this opinion, the act of 1917 would read:

"It shall be unlawful for any person to possess any intoxicating liquor within this state."

The state cites and relies upon *State v. Jarvis* (Iowa), 165 N. W. 61; *Commonwealth v. Mixer,* 207 Mass. 141 (93 N. E. 249, 20 Ann. Cas. 1152, 37 L. R. A. (N. S.) 467); *Wells Fargo v. State,* 79 Ark. 349 (96 S. W. 189); *People v. Roby,* 52 Mich. 577 (18 N. W. 365, 50 Am. Rep. 270); *Seattle v. Brookins,* 98 Wash. 290 (167 Pac. 940), and *State v. Wilbur,* 85 Or. 565 (166 Pac. 51, 167 Pac. 569). We think there is a

marked legal distinction between each of these and the instant case.

The Wilbur case was based on Section 33, Chapter 141, Laws of 1915, and the charge was that a sale of intoxicating liquor was made by an agent of the defendant at the latter's place of business. Section 2370, L. O. L., provides:

"All persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the crime, or aid and abet in its commission, though not present, are principals, and to be tried and punished as such."

And this court in the Wilbur case sustained the following instruction:

"A sale may be made by a man's agents just as well as by himself, and if you find that the sale was actually made by an employee of Mr. Wilbur, Mr. Wilbur will be just as guilty as the man himself."

In the opinion in that case it is said:

"If a principal would avoid conviction for an alleged violation of the law in such manner, he must not keep or have about his premises, and under his control alcoholic beverages which might be illegally sold by his agent or servant on his account or for his benefit."

From the statement of facts in *Seattle* v. *Brookins*, 98 Wash. 290 (167 Pac. 940), it appears that:

"On the night of the day mentioned the place was visited by two police officers, and two quarts of whisky and one-half quart of absinthe were found in the safe therein, three pints of whisky in a storeroom opening off the principal clubroom, and one pint of whisky behind the soft-drink bar. The appellant admitted that the two quarts of whisky and the half quart of absinthe found in the safe were in his possession, but claimed that the whisky was owned by another party"

—and based upon his own statement, the appellate court sustained the conviction of the defendant.

In the Jarvis case (Iowa), 165 N. W. 61, the defendant was indicted for the crime of keeping a liquor nuisance. The evidence tended to show that fifteen pints of whisky were found in defendant's hotel premises and in his possession, and the court held that under the Iowa statute there was a presumption that the whisky was kept there by the defendant for sale and that by reason thereof the burden of proof was upon him to explain the possession and to show that the liquor was not kept with intent to sell. But in that case it was left to the jury—

"to say whether or not the defendant was in fact guilty of keeping the liquor with intent to sell and whether or not the defendant had overcome the presumption which the law attaches to finding the liquor in his possession."

The opinion there says:

"A fair consideration of the court's instructions brings to the mind the thought, and only the thought, in the light of this record, that unless the liquor was found in the possession of the defendant, under his control, the mere finding of it on the premises would not, in and of itself, establish that the defendant was maintaining a place in which intoxicating liquors were kept by him with intent to sell the same in violation of law."

In the Mixer case, 207 Mass. 141 (93 N. E. 249, 20 Ann. Cas. 1152, 31 L. R. A. (N. S.) 467), the question presented was "whether a common carrier or a servant can be convicted of the crime of illegally transporting intoxicating liquor under the statute when he does not know and has no reason to surmise that there is intoxicating liquor in the package delivered for transportation by a seller or consignor," and it was con-

tended by the defendant that because he was an employee of a common carrier and as such bound to accept all packages offered to him for transportation, and as a general rule had no right to compel a shipper to disclose its contents to him when there was no reason to suspect that the package contained an illegal or dangerous object, the statute ought not to be interpreted in such a way as to render him criminally liable if he was in fact innocent of any intent to transgress the law.   In overruling this contention the court there said:

"The legislature may say with respect to transportation of liquors that ordinarily common carriers do not transport them without either knowing or having reasonable ground to suspect their nature, or that usually packages containing them give some evidence of their contents to those reasonably alert to detect it, or that directly or indirectly some information generally is conveyed to the carrier as to their character."

And that:

"The general rule upon which the defendant relies to the effect that a carrier cannot insist ordinarily upon obtaining knowledge of the character of goods offered for transportation is subject to a well-recognized exception where a statute expressly or impliedly confers that right.   The statute with which we are dealing is of that class, and by its imposition of criminal responsibility for transporting the prohibited articles necessarily clothes the carrier with power to obtain such knowledge as may protect him, or to refuse to take the proffered goods."

It was for that reason that the conviction was sustained.

The case of *Wells Fargo* v. *State,* 79 Ark. 349 (96 S. W. 189), was one in which the express company received for shipment what purported to be three packages of furs, which upon examination were found to

contain "a saddle of venison and eight wild turkeys," and the court held that,

"It is no defense that the express company and its agents had no knowledge that the packages contained game."

But it will be noted that this is also a common carrier case, where the defendant had a right to insist upon and make a search of its contents before accepting a package for shipment.

In the *Roby Case,* 52 Mich. 577 (18 N. W. 365, 50 Am. Rep. 270), the statute required all saloons to be closed on Sunday and provided that "any person who shall violate this, among other provisions, shall be deemed guilty of a misdemeanor." It appears from the statement of the case that a clerk of the defendant, who was a saloon-keeper, without his knowledge or consent but while he was on the premises, had opened the saloon on Sunday morning to have it cleaned out and in the meantime had sold· a drink to a casual customer who insisted upon having it. The conviction was sustained and the court held:

"This respondent did not keep his bar closed and he has therefore disobeyed the law. And he has not only disobeyed the law, but the evil which the law intends to guard against has resulted; that is to say, there has been, either with or without his assent,—it is immaterial which,—a sale of intoxicating liquors to a person who took advantage of the bar being open to enter it."

From an examination of all of such authorities and the facts therein stated, and the principles upon which they are based, it will be found that neither of them is in point.

The case of *People* v. *Rice,* 161 Mich. 657 (126 N. W. 981), cited by the defendant, is well considered and lays down this rule:

"While intent is ordinarily an element of crime, the legislature may create offenses without reference to the offender's knowledge of the existence of the facts, but courts are slow to find a legislative intent to condemn a man for not knowing that which he cannot know."

In *Welch* v. *State,* 145 Wis. 86 (129 N. W. 656, 32 L. R. A. (N. S.) 746), cited by defendant, the plaintiff in error was convicted in the lower court of furnishing oleomargarine at a lunch-counter to one Southard, without first notifying him that it was not butter, and the conviction was sustained on appeal. The question was there raised,

"Can a person be convicted of crime without having an opportunity to avoid the act which is held to constitute the crime?"

The court refused to decide that point, saying:

"The answer to this in the instant case is that the evidence does not present that question. The statute imposes a duty upon persons furnishing eatables in hotels, boarding-houses, restaurants or lunch-counters. When one enters upon the business of furnishing guests or patrons with eatables at any of the establishments mentioned he thereby undertakes to inform himself and to know the nature of the substance he is dispensing. The law casts on him this duty. He cannot enter into or continue the occupation and omit the duty. To furnish the substance without knowing what it is and without informing the guests is ordinarily to take the chances of violating the statute."

*State ex rel.* v. *Southern Express Co.* (Ala.), 75 South. 343, involved a bill for an injunction to prevent certain acts or conduct by the company as an interstate common carrier, and it was there held that:

"A carrier would be held to receive at peril of offending the prohibitory and regulatory laws of Ala-

bama consignments destined for transportation into and for delivery in Alabama that were free from cause for suspicion that they contained prohibited liquors or liquors in receptacles of forbidden capacities. Any other interpretation of the federal laws would so heavily burden interstate movements of innocent commerce as that it cannot be supposed that the lawmakers intended such an effect, in the absence of unequivocal statement of a different purpose.''

And that:

''Unless otherwise advised either of the fact that an unlabeled package contained liquors within the description of Section 240 or of circumstances reasonably calculated to arouse suspicion or inquiry with respect to that fact, the carrier to whom a shipment for transportation and delivery in Alabama is proffered may rely upon the absence from a package of the label required by that section as negativing the presence therein of forbidden liquors or liquors in receptacles of prohibited capacities.''

In *Ex parte Ahart,* 172 Cal. 762 (159 Pac. 160), the petitioner was arrested for violating the terms of the liquor ordinance of the town of Covina, which among other things provides:

''Every person who * * transports within the city of Covina, spirituous, or vinous, or malt, or mixed liquors or intoxicating drinks, or vessels for containing the same, to any place, the establishing or keeping of which is prohibited by this ordinance * * shall be deemed guilty of a misdemeanor.''

The syllabus of the opinion contains the following paragraph:

''An ordinance making it a misdemeanor to transport intoxicating liquors to certain prohibited places, construed to apply only where there is evidence of a wrongful intent, not where the act is merely inadvertent.''

91 Or.—34

And the opinion says:

"If this law deliberately made it a crime for the doing, of such an act innocently performed, it would indeed be a harsh one."

By Section 4180 of the Compiled Laws of Oklahoma for 1909 (Snyder), it is made unlawful "to ship, or in any way convey such liquor from one place within the state to another place therein, except the conveyance of a lawful purchase as herein authorized." In the case of *Golpi* v. *State,* 14 Okla. Cr. 564 (174 Pac. 288), the defendant was indicted under that section jointly with an Italian and an Austrian and

"testified that the Austrian asked him to assist him with the packages; that he did not know they contained whisky and had nothing whatever to do with the ownership therein and had no intention of violating the statute."

The trial court was requested by the defendant to give the following instruction, which it refused:

"I instruct you as follows: That before you would be authorized to convict the defendant in this cause, you must believe from the evidence that the defendant knowingly participated in the offense with which he is charged, and unless you find from the evidence, beyond a reasonable doubt, that the defendant, Angelo Golpi, in assisting other parties in carrying the whisky about which testimony has been given knew that he was assisting in the violation of the law, and unless you so believe beyond a reasonable doubt, you should acquit the defendant, and say by your verdict, 'Not guilty.' "

In discussing it, the opinion of the appellate court said:

"The purpose of this requested instruction was to allow the plaintiff in error the advantage of the defense that in good faith he assisted these men, whom

he knew as friends and who he did not know were violators of the law, in carrying their packages, without any knowledge of their contents and without suspecting that they contained intoxicating liquor. The court refused to give the instruction and proper exceptions were saved.

"The question presented resolves itself into the proposition of whether or not a person who is charged with violating the prohibitory law, in that he conveyed intoxicating liquor from one place in a county to another place therein, can avail himself of the defense that he did so innocently. We are of the opinion that this is a good defense and that the instruction should have been given"

—and reversed the judgment of the lower court.

Like our own, the Oklahoma statute does not contain any qualifying words, and while it is true that no authorities are cited in that opinion, the opinion itself seems to be squarely in point.

It appears from the record in the instant case that the defendant was a porter in the employ of the Medford Hotel; that it was his duty to meet the incoming railway trains at the depot and receive the baggage of guests arriving at the hotel from such trains and to transport the baggage to the hotel to be thereafter claimed by the guests; that after receiving the baggage from the guests or railway porters at the trains he would place it on the hotel bus and would then ride on the bus with the baggage to the hotel and place the baggage in the lobby. The defendant testified that he received the suitcase in question from the porter of a sleeping-car in the same manner and under the same conditions that he took baggage belonging to the incoming guests of the hotel from such porters; that he received the suitcase from the railway porter as the baggage of a guest of the hotel and believed it to be such; that he had no property interest therein or any

suspicion that it contained intoxicating liquor, and that the only possession or control which he ever had of the suitcase or its contents was in his capacity as porter, for the purpose of transporting it from the railway station to the hotel.

The defendant was not a common carrier. He did not have control of a place of business which was operated with or without a license; neither was he serving one thing to the public and representing that it was another. He was employed as a porter of the Medford Hotel and his duties in receiving the baggage of guests were more or less those of a servant of the traveling public. It is a well-known fact that porters meet trains and boats and guests arriving at the hotels; that in doing so they receive and handle the grips and suitcases of such guests, yet any traveler would bitterly resent the attempt of a porter or anyone else to make a search of the contents of his hand-bag or suitcase. In the discharge of his duties the defendant did not have the right of search and did not have any choice or discretion in the taking or handling of the baggage of a guest. If the mere act of a porter in lifting a suitcase which contains intoxicating liquors is within itself a violation of the statute in question, then any minister, old lady or the most radical prohibitionist, through chance or design might be made the innocent victim of having intoxicating liquor in his or her possession, and under the instructions given by the trial court in this case could be convicted of that offense. We do not believe that the statute should be so construed, and prefer to adopt the "rule of reason."

2. We hold that it was a question of fact for the jury to find from the evidence, beyond a reasonable doubt, whether or not the defendant knew or had reasonable grounds to know or believe that the suitcase contained

intoxicating liquor at the time when he took it into his possession. The judgment of the Circuit Court is reversed and the cause remanded.

REVERSED AND REMANDED.

HARRIS, J., Concurring.—If the evidence offered by the prosecution is true, then the defendant was indisputably guilty of possessing intoxicating liquor. If, however, the evidence given by the defendant is true, then under what to the writer appears to be the reasonable construction to be placed upon the statute he was not guilty of a crime. If the evidence received in behalf of the state is true then it can be said not only that the defendant had reasonable grounds to know but also that he actually knew that the suitcase contained whisky; but if the evidence received in behalf of the defendant is true then he neither knew nor suspected nor had reasonable grounds to know or to suspect nor had a reasonable opportunity to ascertain that the suitcase contained whisky. It is conceded that the suitcase did contain whisky; the defendant does not claim that the liquor was lawfully in his possession in this state "at the time of the taking effect of" Chapter 40, Laws of 1917; and therefore under the circumstances attending the trial the instructions which the court gave to the jury amounted to a directed verdict. Obedience to the instructions of the court left the jury no alternative except to find the defendant guilty; for the court in effect said to the jury that unless the defendant proved his innocence by showing that the whisky was lawfully in his possession "prior to February, 1917," he was guilty of the crime of possessing intoxicating liquor. Inasmuch as the defendant did not claim that the intoxicants had lawfully come into his possession in this state "prior to February, 1917," the jurors

were in effect advised and they unquestionably understood that they were obliged to return a verdict of guilty if the suitcase contained whisky and if the defendant lifted it off the ground.

The jury was told that "the law absolutely prohibits intoxicating liquor in his (the defendant) possession" and it is manifest from a reading of the record that the jurors understood that the possession of the suitcase alone and of itself inevitably and inexcusably resulted in a crime "whether he knows its contents or not." The state argues that the prohibition of the statute is absolute and all-comprehensive and that therefore when the defendant took the suitcase into his custody he did so at his peril and at the risk of it containing intoxicating liquor; and that if he wished to avoid the possibility of violating the prohibition law he was obliged either not to take the suitcase into his custody or else to compel the owner of it to demonstrate to him, before taking it into his custody, that it did not contain any intoxicating liquor. In a word, the prosecution contends that Section 1 of Chapter 40, Laws of 1917, made the defendant a criminal if, in his capacity as a hotel porter, he took into his possession a suitcase containing whisky, honestly believing that the suitcase was only an ordinary piece of baggage containing the customary and usual belongings of a traveler and in despite of and notwithstanding the fact that he neither knew nor suspected, nor had reason to know or to suspect nor had a reasonable opportunity to ascertain that it contained intoxicants. The position taken by the district attorney is the logical result of the construction which he places upon the statute; and hence in order to determine the question for decision we must first examine the statute and, if possible, ascertain the intent of the legislature.

It will not be without some avail if before noticing the language of the statute we bring ourselves to a full realization of the gravity of the contention made by the prosecution and if we can first come to a thorough understanding of the extremes to which that contention inevitably leads. If the theory of the prosecution is correct then there can be but two kinds of possession; one absolutely rightful and therefore entirely lawful, the other absolutely wrongful and therefore entirely unlawful; and hence there can be no such thing as an unavoidable and innocent possession. If the statute means what the prosecution says it means, then it means that if a passenger either alone or with others boards a crowded train and finds two seats "turned together" with a suitcase or a hand-bag on one or both those seats and, with or without the consent of the owner of the suitcase or hand-bag, lifts it off the seat and places it on the floor for the purpose of making room on the seat for himself or those with him, he is guilty of a violation of the prohibition law if that suitcase or hand-bag contains the smallest conceivable quantity of intoxicating liquor, even though such passenger neither has nor could reasonably entertain the slightest suspicion that intoxicating liquor was hidden within the closed covers of the suitcase or hand-bag, and the fact that such passenger is the most devout religionist or the most active and ardent prohibitionist cannot release him from the relentless grasp of the law; it means that if a passenger in the act of boarding or alighting from a train delivers his hand-bag to a brakeman stationed at the foot of the steps to be handed up to him as soon as he has ascended the car-steps or given to him after he has descended from the steps, the brakeman becomes a lawbreaker if the hand-bag contains intoxicants although the brakeman does

not know and cannot know because he has no means or opportunity of ascertaining what is in the hand-bag, and if the brakeman repeats the act a second and a third time he may be sent to the penitentiary; it means that if a passenger moves an overcoat, belonging to another, from one to another seat or places it in the rack or hangs it on a hook, either with or without the express consent of the owner, he commits a crime if in one of the pockets of that overcoat there happens to be a bottle containing intoxicating liquor and he cannot escape from the penalty of that crime by showing that he did not know what was in the pocket of the overcoat; it means that if the driver of an automobile passes a friend or stranger afoot and carrying baggage and as an act of pure kindness invites the footman to ride and assists him to lift his baggage into the automobile, the driver violates the prohibition law if that baggage has concealed in it any quantity of intoxicating liquor; it means that every taxicab driver who receives passengers and assists them with their baggage into and out of the taxicab, touches that baggage at his peril and if it contains intoxicants he breaks the law; it means that every person who for a single moment takes into his or her possession any suitcase, hand-bag, box or package without first examining its contents or any garment without first going through its pockets does so at his or her peril. These supposed examples are neither highly imaginative nor overdrawn, but every one of the supposed happenings has probably occurred many times since the enactment of the statute; and they are likely to occur every time intoxicating liquor is brought into this state in a suitcase, or a hand-bag, or an overcoat, or a box of any kind. Now with these examples and many more which can readily be suggested as likely to occur in the work-a-day lives of hon-

est, law-abiding, yea law-enforcing citizens, can it reasonably be said that the legislature intended that its language should or would receive the construction placed upon it by the prosecution?

All will of course concede that the legislature has authority, in the exercise of its police powers, to forbid the doing of an act and to impose criminal penalties for the doing of such act without regard to the intent or knowledge of the doer; the purpose being, as said in *People* v. *Roby,* 52 Mich. 577, 579 (18 N. W. 365, 50 Am. Rep. 270), "to require a degree of diligence for the protection of the public which shall render violation impossible": *State* v. *Gulley,* 41 Or. 318, 321 (70 Pac. 385); 16 C. J. 76. It must be conceded, too, that the legislature can in the exercise of its police power forbid and penalize with fine and imprisonment the manufacture or sale or possession of intoxicating liquors: *Mugler* v. *Kansas,* 123 U. S. 623 (31 L. Ed. 205, 8 Sup. Ct. Rep. 273); *In re Crane,* 27 Idaho, 671 (151 Pac. 1006, L. R. A. 1918A, 942), affirmed by the United States Supreme Court in *Crane* v. *Campbell,* 245 U. S. 304 (62 L. Ed. 304, 38 Sup. Ct. Rep. 98); *Seattle* v. *Brookins,* 98 Wash. 290 (167 Pac. 940, 941). While the legislature undeniably possesses conceded authority to forbid the doing of a specified act and to punish the doing of such forbidden act, yet this broad power, as announced by Mr. Chief Justice RUDKIN in *State* v. *Strasburg,* 60 Wash. 106 (110 Pac. 1020, Ann. Cas. 1912B, 925, 32 L. R. A. (N. S.) 1216), "is not without constitutional limitations and restraints, and we can hardly conceive of a valid penal law which would punish a man for the commission of an act which the utmost care and circumspection on his part would not enable him to avoid." See, also, the unanswered question suggested in *Welch*

*v. State,* 145 Wis. 86, 89 (129 N. W. 656, 32 L. R. A. (N. S.) 746). It will not be necessary here to attempt to fix or define the limitations upon the power of the legislature to forbid the doing of a specified act irrespective of the knowledge or intent of the doer, since it will be assumed for the purposes of the discussion that the legislature had full power to do all that the district attorney claims that it has done.

It remains then to ascertain the intention of the lawmakers when they amended Section 5 of Chapter 141, Laws of 1915, by enacting Section 1 of Chapter 40, Laws of 1917, as follows:

"Except as hereinafter provided in this amendatory Act it shall be unlawful for any person to receive, import, possess, transport, deliver, manufacture, sell, give away or barter any intoxicating liquor within this State; and the place of delivery of any intoxicating liquor is hereby declared the place of sale; provided, that it shall not be unlawful for any person to have in his possession intoxicating liquor lawfully procured and in the possession of such person within this State at the time of the taking effect of this amendatory Act, or lawfully obtained or received under the provisions of this Act."

Reduced to its briefest terms the act of 1917 makes it unlawful for any person to possess intoxicating liquor unless he possessed it when the act became effective or obtained or received it under the provisions of the act.

The circumstance that the word "knowingly" does not appear in the act is not conclusive; but the question of whether or not this statute is to be construed to mean that proof of the custody of a suitcase containing intoxicating liquor is conclusive proof of guilt regardless of whether the defendant knows or suspects, or has reasonable grounds to know or suspect, or has a rea-

sonable opportunity to learn that the suitcase contains liquor, must be determined by considering the subject matter of the statute, the language of the act, the evil sought to be eradicated or prevented and the consequences of the several constructions to which the statute may be susceptible. It is, as was tersely announced in *Wells Fargo & Co. Express* v. *State,* 79 Ark. 349, 351 (96 S. W. 189), "a matter of construction, from the subject matter and the evil to be remedied, whether such words ("knowingly" and "willfully") are to be implied, or the statute enforced as written": *Matter of Application of Ahart,* 172 Cal. 762, 764 (159 Pac. 160) ; *Com.* v. *Weiss,* 139 Pa. St. 247 (21 Atl. 10, 23 Am. St. Rep. 182, 184, 11 L. R. A. 530) ; *Troutner* v. *State,* 17 Ariz. 506 (154 Pac. 1048, L. R. A. 1916D, 262, 263) ; 2 Lewis' Sutherland on Stat. Const. (2 ed.), § 527; 8 R. C. L. 62, 63.

The legislature has the power, within certain limitations, as already stated, to declare that the doing of a specified act shall constitute a crime and that it shall be punished by fine or imprisonment or both, and, therefore, if the language and subject matter of the statute show clearly that it was the manifest intention of the legislature to make the doing of such specified act a crime regardless of the knowledge or intent of the doer, the courts will give effect to the intention of the lawmakers however harshly the statute may seem to operate in a given instance: *State* v. *Shevlin-Carpenter Co.,* 99 Minn. 158 (108 N. W. 935, 9 Ann. Cas. 634, 636) ; but, in the language of the Supreme Court of Michigan, "courts are, however, slow to find a legislative intention to condemn a man for not knowing that which he cannot know": *People* v. *Rice,* 161 Mich. 657, 664 (126 N. W. 981, 984).

One thoroughly established and oft-applied rule of statutory construction is that a statute should be so construed as to give a sensible and intelligent meaning to every part, to avoid absurd and unjust consequences. The courts can apply common sense to the terms employed in a statute in order to avoid an absurdity which the legislature ought not to be presumed to have intended. ⌉ A statute which leads to the consequences which will necessarily result from the construction which the prosecution asks us to adopt ought, as declared by Mr. Chief Justice LORD, "not only to be clear, but mandatory, and the act done under it not only within the letter, but within the spirit, of the law, to authorize its enforcement": *State* v. *McGuire*, 24 Or. 366, 371 (33 Pac. 666, 668, 21 L. R. A. 478). The pronouncement of Mr. Justice FIELD in *United States* v. *Kirby*, 7 Wall. 482 (19 L. Ed. 278), is sufficiently apropos to justify an extended quotation from the recorded opinion:

"All laws should receive a sensible construction. General terms should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence. It will always, therefore, be presumed that the legislature intended exceptions to its language, which would avoid results of this character. The reason of the law, in such cases, should prevail over its letter.

"The common sense of man approves the judgment mentioned by Puffendorf, that the Bolognian law which enacted, 'That whoever drew blood in the streets should be punished with the utmost severity,' did not extend to the surgeon who opened the vein of a person that fell down in the street in a fit. The same common sense accepts the ruling, cited by Plowden, that the Statute of 1 Edward II, which enacts that a prisoner who breaks prison shall be guilty of a felony, does not extend to a prisoner who breaks out when the

prison is on fire—'for he is not to be hanged because he would not stay to be burnt.' "

And the writer thinks that a like common sense will sanction the ruling that the statute which makes it a crime to possess intoxicating liquor does not apply to a hotel porter who in the performance of his usual and customary duties merely takes a suitcase into his custody and places it upon a bus to be conveyed to a hotel, without knowing, or having reasonable ground to suspect, or a reasonable opportunity to ascertain that the suitcase contains intoxicating liquor. Precedents which are peculiarly pertinent to the subject now discussed are the following: *Golpi* v. *State* (Okl. Cr.), 174 Pac. 288; *De Hasque* v. *Atchison, T. & S. F. Ry. Co.* (Okl.), 173 Pac. 73, 77, L. R. A. 1918F, 259; *Matter of Application of Ahart*, 172 Cal. 762 (159 Pac. 160); *State* v. *Swett*, 87 Me. 99 (32 Atl. 806, 47 Am. St. Rep. 306, 29 L. R. A. 714). The rules of construction, to which attention has already been directed, are amply supported by judges and text-writers: *State* v. *Fisher*, 53 Or. 38, 41 (98 Pac. 713); *In re Chapman*, 166 U. S. 661, 667 (41 L. Ed. 1154, 17 Sup. Ct. Rep. 677); *Tsoi Sim* v. *United States*, 116 Fed. 920 (54 C. C. A. 154, 5 L. R. A. 342, 343, note); 2 Lewis' Sutherland on Stat. Const. (2 ed.), §§ 516, 526; 36 Cyc. 1108–1112; *State* v. *Goss*, 59 Vt. 266 (9 Atl. 829, 59 Am. Rep. 706); *The Nitro-Glycerine Case*, 15 Wall. 524 (21 L. Ed. 206); *State ex rel.* v. *Southern Express Co.* (Ala.), 75 South. 343, 350; 16 C. J. 76–78.

Cases where a defendant is convicted of selling some prohibited article, for example oleomargarine or intoxicating liquor, are easily distinguishable from the case presented here. Because of the misery, poverty and crime that accompany the consumption of intoxicating liquor the state has outlawed such liquor by pro-

hibiting its sale or possession so that its consumption and therefore the evils which go with its consumption may be prevented. A person who sells an article is bound to know that the article which he sells is not intoxicating and he cannot defend by saying that he did not know that the article sold by him was intoxicating. Applying the accepted rules of construction it is obvious that the statute would fail to accomplish its purpose if the seller of an article could defeat a prosecution by showing that he did not know the character of the article disposed of by him. The seller has an opportunity to know what he sells and therefore is bound to know that what he sells is not of the forbidden kind. The legislature must be presumed to have enacted the statute with a knowledge of the manner in which people usually and ordinarily live and conduct their business and social affairs, and hence it can readily be seen that the lawmakers intended that sellers could and therefore must know what they sell; and it can just as readily be seen that in addition to instances where persons knowingly possess intoxicating liquor the legislature was also aware of the many instances which are bound to occur where a person happens temporarily to have in his or her custody a piece of baggage, a box, a garment or a parcel in which there may be intoxicants without the temporary custodian knowing or being reasonably able to learn of the contents of the baggage, box, garment or parcel.

To hold that the defendant violated the prohibition law when he lifted the suitcase off the ground "whether he knows of its contents or not" and without regard to his opportunity to know what was contained in the suitcase is to hold not only that the statute was designed to reach those who knowingly or in reason ought to know when they take contraband liquor into their

possession, but also that it was deliberately contrived to serve as a trap to ensnare the unwary and to enmesh law-abiding and law-enforcing citizens.   Not until the legislature uses clear and mandatory language will the writer believe that the legislature intended any such consequences as must and will flow from the construction which the plaintiff places upon the word ''possess'' as used in the statute. Nor will the statute be emasculated.   It will be no more difficult to convict a person of a guilty possession of intoxicating liquor than it will to convict of any other crime requiring either knowledge or an opportunity to gain knowledge.   And be it remembered that most of our statutes defining crimes embrace the element of knowledge or its legal equivalent, an opportunity for knowledge.   The legislature intended to prohibit persons from possessing intoxicants when they know or have reasonable ground to believe or have an opportunity to know that they possess intoxicating liquor; but the prohibition does not include the person who neither knows nor suspects nor has reasonable ground to believe nor has an opportunity to know that a suitcase, which is temporarily in his custody, contains intoxicating liquor.

I concur with the conclusion reached by Mr. Justice JOHNS.   The judgment should be reversed and the cause remanded for a new trial.

BURNETT, J., Dissenting.—Based upon the interpellations of the jurors and the answers of the court, the defendant took two exceptions which thus appear in the record:

''The defendant excepts to that portion of the charge given to the jury wherein the court instructed the jury that under the circumstances disclosed by the evidence in this case, the defendant might be guilty of the crime charged in the indictment even though he had no in-

tention of committing said crime, in so far as the instructions so state.

"The defendant excepts to that portion of the foregoing charge wherein the court instructed the jury that the defendant might be guilty under the circumstances disclosed by the evidence in this case even though he had no interest therein, merely because he lifted the suit case off the ground and transported it as a porter of the hotel, in so far as the instructions so state."

That the first exception is without merit is taught by many cases already decided by this court, to the effect that where a defendant is accused of a misdemeanor which is merely *malum prohibitum,* and not *malum in se,* it is not requisite to prove a criminal intent: *State* v. *Chastain,* 19 Or. 176 (23 Pac. 963); *State* v. *Sterritt,* 19 Or. 352 (24 Pac. 523); *State* v. *Gulley,* 41 Or. 318 (70 Pac. 385); *State* v. *Brown,* 73 Or. 325 (144 Pac. 444); *State* v. *Wilbur,* 85 Or. 565 (166 Pac. 51, 167 Pac. 569).

The second exception merits more careful consideration, but must be decided upon the same principles which underlie the precedents already cited, namely, that if in such cases a defendant has committed the act against which the statute was directed, he comes within the ban of the law, irrespective of any element not included in the statutory denunciation of the offense.

As said by Dr. Wharton in Volume 1, Section 113, of the Eleventh Edition of his treatise on Criminal Law:

"The function of imposing indictability on pernicious acts irrespective of intent is one which has been exercised by legislatures, not only frequently but from necessity. It may be indispensable to public safety that storing of gunpowder, or of highly inflammable oils, in exposed localities should be prohibited; and as in such cases the statutes could be easily eluded if a *scienter* be requisite to conviction, the policy that requires the enactment of the statute requires also that

the statute should relieve the prosecution from proving a *scienter*. Sometimes this is done by an express clause in the statute, as where * * it is provided that persons selling spirituous liquors shall be 'deemed' common sellers of the same, or that delivery of such liquors shall be proof of sale, or that persons carrying concealed weapons shall be presumed to carry them knowingly. Such provisions are constitutional as concerning matters of process, and are illustrated by statutes prescribing that a person not heard of for a specific period shall be presumed to be dead, and that debts not acknowledged within a specific period shall be presumed to be paid. If this can be done by an express clause, it can be done by implication; and if so, where the legislature imposes a specific penalty on a person doing a particular thing, irrespective of *scienter,* it will be the duty of the courts to enforce the prohibition. The question is one of policy; and this may be taken into consideration when the legislative meaning is sought. That a man should be convicted of a malicious act without proof of malice, or of a negligent act without proof of negligence, is, of course, an enormity which no legislature could be supposed to direct. But it is otherwise as to certain mischievous acts which it may be a sound policy to prohibit arbitrarily, because they imperil public safety (as, for example, the selling of intoxicating drinks and defective storing of explosive compounds), and because to require *scienter* to be proved would be to defeat the object of the statutes, since in many cases, and those the most dangerous of the class, it would be out of the power of the prosecution to prove *scienter* beyond reasonable doubt. The legislature may properly say, 'In such cases we presume *scienter;* whoever deals with these dangerous agencies does so at his risk.' * * *A fortiori* is this the case when a statute, on grounds of public policy, makes *scienter* irrelevant. It is also to be observed that to declare that honest ignorance of fact is a defense would extend the same privilege, in many cases, to honest ignorance of law. Ignorance, for instance, that the state pro-

hibits by indictment dealing with minors is morally as good a defense, in cases where the party dealt with has apparently reached majority, as is ignorance that such party is a minor.    In both cases the defendant is ignorant that he is doing an illegal thing.    That in the former case it is conceded that such ignorance is no defense shows that honest belief that an illegal act is legal is no necessary ground for acquittal.    We cannot, therefore, lay down the rule that ignorance of inculpatory facts shall always be a defense, without extending the same immunity to ignorance of inculpatory law.    And if we cannot so extend this immunity, then we must hold that ignorance does not necessarily acquit when *scienter* is not an essential of the offense.''

In *Halsted* v. *State,* 41 N. J. Law, 560 (32 Am. Rep. 247, 1 Crim. Law Mag. 340), Mr. Chief Justice BEASLEY exhaustively discusses the principle here involved. He contracts the argument that in all cases of violation of law there must be a guilty mind, with the other contention that in mere statutory misdemeanors made such solely by the enactment, it is enough to prove the act without establishing either *scienter* or guilty intent. He then proceeds thus:

''Now these two classes of cases, diverging as they do, and seemingly standing apart from each other, may at first view appear to be irreconcilable in point of principle; but, nevertheless, such is not the case. They all rest upon one common ground, and that ground is the legal rules of statutory construction. None of them can legitimately have any other basis. They are not the products of any of the general maxims of civil or natural law.    On the contrary, each of this set of cases is, or should have been, the result of the judicial ascertainment of the mind of the legislature in the given instance.    In such investigations the dictates of natural justice, such as that a guilty mind is an essential element of crime, cannot be the ground of decision, but are merely circumstances of weight, to have their effect in the effort to discover the

legislative purpose. As there is an undoubted competency in the lawmaker to declare an act criminal, irrespective of the knowledge or motive of the doer of such act, there can be, of necessity, no judicial authority having the power to require, in the enforcement of the law, such knowledge or motive to be shown. In such instances the entire function of the court is to find out the intention of the legislature, and to enforce the law in absolute conformity to such intention.''

An Arkansas enactment made it unlawful for an express company to receive for shipment or export, or carry beyond the state line certain kinds of game, including deer and wild turkey. As portrayed in *Wells Fargo & Company Express* v. *State*, 79 Ark. 349 (96 S. W. 189), the company received at a point in Arkansas for shipment to St. Louis, Missouri, what appeared to be three packages of furs, but in fact, as disclosed by a search, they contained a saddle of venison and eight wild turkeys. Discoursing upon the contention of the company that neither it nor its agents or employees had any knowledge that the packages contained game, the court, after citing authorities, goes on to state the principle thus:

''Without attempting to formulate any rule on the subject, suffice it to say that the statute in question seems to be exactly of the kind where ignorance does not excuse, and where criminal intent is not necessary. Doubtless, such statutes work individual cases of hardship, as the one at bar, where the company was imposed upon; but, unless the Legislature had made the act itself the crime, there would have been no use in passing the law. The ease with which game and fish could be inclosed in packages to deceive the express agents would render a statute against knowingly receiving game or fish an idle form.''

The subject of being present where gaming implements are found was under consideration in *Common-*

*wealth* v. *Smith,* 166 Mass. 370 (44 N. E. 503), concerning which Mr. Justice HOLMES, in delivering the unanimous opinion of the court, said:

"It is unnecessary under the statute to allege the defendant's knowledge of the presence of the implements or the character of the place. The statute means that people enter such places at their peril. It goes no further than other statutes which have been enforced by this court. When according to common experience a certain fact generally is accompanied by knowledge of the further elements necessary to complete what it is the final object of the law to prevent, or even short of that, when it is very desirable that people should find out whether the further elements are there, actual knowledge being a matter difficult to prove, the law may stop at the preliminary fact, and in the pursuit of its policy may make the preliminary fact enough to constitute a crime. It may say that, as people generally do know when they are selling intoxicating liquors, they must discover at their peril whether what they sell will intoxicate."

Another case from the same court is *Commonwealth* v. *Mixer,* 207 Mass. 141 (93 N. E. 249, 20 Ann. Cas. 1152, 31 L. R. A. (N. S.) 467). We quote this statement from the opinion:

"The defendant, a driver in the employ of a common carrier, had upon his load for transportation in Lynn a sugar barrel, not marked by the seller or consignor as required by Rev. Laws, Chap. 100, Section 49, for packages containing intoxicating liquors. There was nothing about the appearance of the barrel to cause suspicion as to its contents, and the defendant was ignorant of the fact that it contained intoxicating liquor. The Superior Court refused to instruct the jury that, unless the defendant knew that the barrel contained intoxicating liquor, or, from its appearance and all the circumstances, ought reasonably to have been put on inquiry as to its contents, he should be

acquitted.   The question presented is whether this re-
fusal was error.''

After mentioning the precept that in many cases it
is necessary to prove a criminal intent, the court, speak-
ing through Mr. Justice RUGG, goes on to say:

''But there are many instances in recent times
where the legislature in the exercise of the police power
has prohibited under penalty the performance of a
specific act.   The doing of the inhibited act constitutes
the crime, and the moral turpitude or purity of the mo-
tive by which it was prompted, and knowledge or
ignorance of its criminal character, are immaterial cir-
cumstances on the queston of. guilt.   The only fact to
be determined in these cases is whether the defendant
did the act.   In the interest of the public the burden is
placed upon the actor of ascertaining at his peril
whether his deed is within the prohibition of any crim-
inal statute.''

This doctrine is supported by a very long list of au-
thorities cited in the opinion, and the action of the trial
court in refusing the instruction was approved: See,
also, the opinion of Mr. Justice COOLEY in *People* v.
*Roby*, 52 Mich. 577 (18 N. W. 365, 50 Am. Rep. 270).
The analogy is supported in *State* v. *Ross*, 55 Or. 450
(104 Pac. 596, 106 Pac. 1022, 42 L. R. A. (N. S.) 601,
613), holding that the act of converting public money
to his own use was sufficient to incriminate one with-
out regard to his intent in the matter.

The case of *State ex rel. Black* v. *Southern Express
Co.* (Ala.), 75 South. 343, cited here by the defendant,
has had our attention.   The statute of Alabama on the
subject of importing intoxicating liquor into the state
prescribed that its containers should hold neither more
nor less than one quart.   The suit was for injunction to
prohibit the defendant, a common carrier, from bring-
ing into the state any intoxicating liquor whatever.   The

court held that inasmuch as the federal statute (U. S.
Comp. Stats. 1918, § 10410), condemned "whoever shall
*knowingly* ship or cause to be shipped from one state
into any other state * * any package of or package
containing any spirituous, vinous, malted, fermented
or intoxicating liquor of any kind, unless such package
be so labeled on the outside cover as to plainly show the
name of the consignee, the nature of its contents and
the quantity contained therein," the company was ex-
cused from the mere act of importing a package not so
marked, but that the injunction should run against its
importing even such a package if it contained bottles
holding more or less than one quart. The reason given
was that the enforcement of such a regulation would
impose too great a burden upon the interstate move-
ments of innocent commerce. It is not apparent to the
writer why even for this reason the carrier should be
excused from transporting an unmarked package, but
should be held liable and enjoined from transporting
the same package if the bottles within it, secure from
observation as they were, should be greater or less than
quart size. The court there recognizes the application
of the principles we have extracted from the authori-
ties above cited, and hinges its decision on the federal
statute already quoted, which contains the element of
knowledge, but in summing up the case bases its in-
junction against the defendant on a circumstance of
which it could have no knowledge unless it should open
and examine the contents of every unmarked package
which came into its possession. The precedent is not
deemed controlling in the instant case.

The policy in laws of this kind is analogous to the
principles and practices underlying the laws regulating
the customs duties where goods are forfeited for viola-
tion of the regulations, irrespective of the knowledge

or intent of the owners.   A sample case of the kind is that of *United States* v. *58,850 Cigars,* 25 Fed. Cas. No. 15,092.   In that instance a drunken sea captain had permitted the cigars in question to be smuggled aboard the ship of which he was in charge in a foreign port. The cigars were concealed behind partitions, under floors and the like, all without the knowledge or consent of the owners and entirely against their ordinary practice and behavior.   On arrival at its home port, the vessel was libeled at the instance of the revenue officers and it was held on appeal that the concealment of goods which works a forfeiture need not be with the knowledge or consent of the owner or consignee.   In summing up, the court said:

"To require the co-operation of the owner in concealing the property to be shown, would leave a wide opening for fraud.   No doubt cases of hardship may possibly occur; but they are provided for by the power to remit the forfeiture, lodged with the secretary of the treasury."

So, in the enforcement of the prohibition law, we must recognize that it is within the power of the legislative branch of the government to make a misdemeanor of the mere possession of the forbidden liquor. That branch of the government has the right to impose upon the individual citizen the responsibility for his own acts, irrespective of his knowledge, and while the result may work hardship in some instances, yet it is not for the courts to read into the statute the element of *scienter* which is not found there.   As a matter of policy doubtless influencing the legislative mind, it is much easier for the individual so to guard his own actions as not to be found in possession of intoxicating liquors within the ban of the statute, than for the state to prove his actual knowledge on the subject, under

ordinary circumstances. Hence, it was within the province of the lawmakers to omit that element so often found in the definitions of misdemeanors. To say in the face of the enactment before us that it must be shown that the defendant knew he had liquor in his possession would be practically to destroy the efficiency of the statute and make it well-nigh impossible to secure convictions against the mere purveyor of intoxicating liquor, who would, of course, disclaim knowledge of or property in it when detected in possession of it. The imagination can easily conjure up a situation where by trickery and fraud a case might be framed up against an innocent man, by slyly dropping into his pocket a small vial of whisky or concealing it about his automobile, or the like, so that apparently he would be in possession of the same; but the possibility that such a thing might happen is no reason why the judiciary should refuse to enforce the mandate of the law-making branch of the government. The remedy for such possible evils must be found either in the legislative prerogative or in the executive power to pardon. They are not likely to occur often in practice, and the harm arising from such imaginary cases is slight in comparison with the practical destruction of the statute if we construe it as if to write into it in all cases the element of knowledge.

It remains to determine whether or not the defendant was in possession of the suitcase and its contents by picking it up on the railway platform and putting it on board the hotel bus. A simple illustration should dispose of that question: Suppose that he had no intimation of what was in the suitcase, yet held on to it and kept it in his custody without opening it. No one could rightly deny that he had such possession of it as would sustain an action of replevin by the true owner who

would seek to recover the suitcase and the twelve bottles of whisky, conceding for the sake of the argument that the liquor is the subject of property. The defendant in that litigation, as in the present, might deny all of the allegations of the complaint, yet they would be established by proving that the grip and its contents were in his custody.

In *Rice* v. *Frayser* (C. C.), 24 Fed. 460, it is said:

" 'Possession' is that condition of fact under which one can exercise his power over a corporeal thing at his pleasure, to the exclusion of all others."

In *State* v. *Washburn,* 11 Iowa, 245, the subject under consideration was the possession of counterfeit coin. The defendant had concealed it in a place unknown to others and at the time of his arrest he was not near the spot where the forbidden stuff was hidden. The court said:

"If the coin was in the power of the prisoner in such a sense that he could and did command its use, the possession was as complete within the meaning of the statute as if it had been actual."

*People* v. *Mills,* 178 N. Y. 274 (70 N. E. 786, 67 L. R. A. 131), was a case where the defendant was indicted for an attempt to steal some indictments in which his clients were accused of crime. He was convicted, though he only put the documents into his pocket on delivery to him by a detective to trap him. They were held to be in his possession. It was decided in *Harrison* v. *People,* 50 N. Y. 718 (10 Am. Rep. 517), that a pickpocket was in possession of a pocketbook, though he took it only part way out of the owner's pocket when the latter struck off the hand of the thief so that the book dropped back into the pocket. *McMahon* v. *State,* 70 Neb. 722 (97 N. W. 1035), declares that game unlawfully killed was in the posses-

sion of one who was in a hunting party, although it was found in a buggy in which he was.not riding and which belonged to another one of the party. The court in *Brown* v. *Volkening,* 64 N. Y. 76, said:

"Possession means simply the owning or having a thing in one's own power."

The circumstances of *Campbell* v. *State,* 3 Ala. App. 76 (57 South. 412), were that a foreman with his gang of men on pay-day went to the office of the employing concern to receive their wages. His name was called first, the money due him was counted out. and laid on the counter in his presence by the paymaster. Without taking it into his hand, the foreman turned to sign the pay-roll and while his attention was thus diverted from the money, one of the gang seized it and ran away with it. He was apprehended and brought back to the office, where the paymaster recounted the money, and as against the thief it was held that the money was in the possession of the foreman although he had not touched · it when the defendant seized it and carried it away.

In considering the evil at which the statute is aimed, we cannot restrict the term "possess" so as to make it mean absolute ownership. It must be taken to include the wider signification given it by the precedents quoted and to be satisfied with proof of actual custody. Public sentiment crystallized in the form of a constitutional amendment supported by the drastic legislation in question, has substantially outlawed intoxicating liquor, so that the individual handles it at his peril, barring the few statutory exceptions. The legislative power has seen fit to omit the element of knowledge in the matter of possession, and the citizen must see to it that he does not possess the forbidden article. Whatever actual hardship may arise from the enforcement · of the law as we find it upon the statute book must be

obviated or alleviated in the first instance by the pardoning power and later, possibly, by legislative amendment relaxing the rigor of the present statute. Each of these remedies is beyond the power of the judiciary and we can enforce the law only as we find it.

It is not by the mark to say that, in his capacity as porter, the defendant has no right to inspect the baggage of guests who offer it to him for carriage. On the contrary, as a citizen, subject to the law of the land which is paramount to his obligation as a porter, he has a right to be shown by those who would avail themselves of his assistance that he will not commit crime by taking their goods into his possession. The same reasoning is applicable to him as to common carriers and, like them, he may decline a service involving a violation of the law.

The record shows that the defendant had the liquor in his actual possession. His knowledge or ignorance of it is not an element of the offense defined by the statute. The Circuit Court was right in disregarding his contention on that point. A decision to the contrary would emasculate the prohibition statutes and open wide the door for frauds upon the law.

The conviction should be affirmed.

BEAN and BENSON, JJ., concur in this dissenting opinion.