Argued June 11; affirmed June 25, 1946

STATE *v.* OPIE

(170 P. (2d) 736)

ROBERT D. LYTLE, Judge.

*H. H. De Armond* (De Armond & Goodrich, of Bend, on the brief), for appellant.

*Leland S. Duncan,* District Attorney (with Leonard H. Waterman, of Burns, former District Attorney, for Harney County, on the brief), for respondent.

Before BELT, Chief Justice, and ROSSMAN, KELLY, BAILEY, LUSK and BRAND, Justices.

## BRAND, J.

The statute provides that

"Every person who takes or uses without authority of the owner or person entitled to possession thereof and not seized under judicial process or not distrained for trespass, any * * * bull, cow, steer, calf or heifer, or who shall be a party to any such unauthorized taking or using, upon conviction thereof, shall be punished by imprisonment in the state prison for not more than two years, or by a fine * * *." O. C. L. A. § 32-1802.

The indictment so far as relevant here reads as follows:

"Hazel Opie is accused by the Grand Jury of the County of Harney by this Indictment of the crime of Larceny of Calf committed as follows:

"The said Hazel Opie on or about the 22 day of July A. D. 1944, in the said County of Harney and State of Oregon, then and there being, did then and there willfully and feloniously take and was a party to the taking, without authority of the owner or person entitled to the possession thereof

and not seized under judicial process or not distrained for trespass a certain calf, the same being an unbranded red and white Hereford calf, the property of Lyle Hill, although the mother of such calf was branded with the recorded brand of Hill Brothers, which the said Lyle Hill exclusively used contrary to the statutes,'' etc.

The indictment was not tested by demurrer. The defendant plead not guilty and upon trial was convicted by the jury and sentence was imposed.

As her first proposition of law, the defendant asserts that

''The act uses words of no determinative meaning, and the language is so general and indefinite as to embrace not only acts properly and legally punishable, but also others which cannot be punished; and for this reason is void for uncertainty.''

■ It is suggested that one who honestly and in good faith takes possession of an animal reasonably believing it to be his own would be subject to punishment under the statute. We think not.

We have very recently had occasion to give extended consideration to the ''void for vagueness'' doctrine. *State v. Anthony*, May 28, 1946, post p. 282, 169 P. (2d) 587. In that case we cited the statute which provides:

''The rule of the common law that penal statutes are to be strictly construed has no application to this Code, but all its provisions are to be construed according to the fair import of their terms, with a view to effect its objects and to promote justice.'' O. C. L. A. § 23-106.

We then said:

''But the rule of strict construction, if applicable, has little bearing in a case of this kind. The problem

here is not whether we can extend a penal statute beyond the meaning of the words used. The question is whether we can properly limit the meaning of general words to cases reasonably within them and within the evil which the legislature intended to suppress." *State v. Anthony,* supra.

We then cited numerous instances in which this court has upheld criminal statutes couched in general and indefinite terms when applied to cases clearly within the prohibiting language as narrowly construed. We held that

"It cannot be said that every statute containing broad and indefinite prohibitions is to be held unconstitutional as wanting in due process. A criminal statute passed pursuant to the police power should be stricken down for indefiniteness only if it cannot be saved wholly or in part by judicial application of the rules of statutory construction." *State v. Anthony,* supra.

And we referred with approval to the statement of Bishop:

"It is common, in the interpretation of statutes of every class, to except out of their operation cases clearly not within the mischief intended to be remedied." Bishop, Statutory Crimes (3rd ed.) 213.

The principles recognized in *State v. Anthony* are not new to the jurisprudence of this state. In the case of *State v. Cox,* 91 Or. 518, 179 P. 575, the defendant was charged with the unlawful possession of intoxicating liquor. The complaint was based upon a statute which provided that "it shall be unlawful for any person to * * * possess * * * any intoxicating liquor within this state." The defendant was convicted, and, on appeal to this court, the question for decision was whether guilty knowledge was a material element which

the state was required to prove. The statute contained no reference to any such element. If guilty knowledge was a material element of the charge, then it was conceded that there was a conflict of evidence upon that issue which should have been but. was not submitted to the jury by proper instructions.

In an able concurring opinion, Justice HARRIS said:

"The circumstance that the word 'knowingly' does not appear in the act is not conclusive; but the question of whether or not this statute is to be construed to mean that proof of the custody of a suitcase containing intoxicating liquor is conclusive proof of guilt regardless of whether the defendant knows or suspects, or has reasonable grounds to know or suspect, or has a reasonable opportunity to learn that the suitcase contains liquor, must be determined by considering the subject matter of the statute, the language of the act, the evil sought to be eradicated or prevented and the consequences of the several constructions to which the statute may be susceptible. It is, as was tersely announced in Wells Fargo & Co. Express v. State, 79 Ark. 349, 351 (96 S. W. 189), 'a matter of construction, from the subject matter and the evil to be remedied, whether such words ('knowingly' and 'willfully') are to be implied, or the statute enforced as written.'

"A statute which leads to the consequences which will necessarily result from the construction which the prosecution asks us to adopt ought, as declared by Mr. Chief Justice LORD, 'not only to be clear, but mandatory, and the act done under it not only within the letter, but within the spirit, of the law, to authorize its enforcement'." *State v. Cox,* supra.

In conclusion he said:

"The legislature intended to prohibit persons from possessing intoxicants when they know or have

reasonable ground to believe or have an opportunity to know that they possess intoxicating liquor; but the prohibition does not include the person who neither knows nor suspects nor has reasonable ground to believe nor has an opportunity to know that a suitcase, which is temporarily in his custody, contains intoxicating liquor." *State v. Cox,* supra.

A similar construction has been placed upon the statute regulating the taking up of estrays. That statute provides that "any person who shall take up any estray otherwise than according to the provisions of this act, * * * shall be deemed guilty of larceny * * *." O. C. L. A. § 32-1407.

In that case the court said:

"Before a defendant can be found guilty of a violation of the law he must knowingly have exercised acts of possession or confinement of an estray. He must have known that the estray did not belong to him. The word 'knowingly' is not used in the statute, it is true, but we believe that it is implied." *State v. Aschenbrenner,* 171 Or. 664, 138 P. (2d) 911, 147 A. L. R. 1052.

If, as defendant argues, the language employed in the statute embraces not only acts legally punishable, "but also others which cannot be punished," the task of construction should be comparatively simple. We should hold that the acts that cannot be punished are not within the prohibitive intent of the statute.

Since the violation of the statute may constitute a felony, we think it should not be construed to cover an honest and non-negligent mistake. Whether or not the legislature has power to punish such a mistake, we hold that it has not done so, and that, as in *State v. Aschenbrenner,* supra, the element of guilty knowledge is implied in the statute. Furthermore, the indictment

specifies that taking was willful and felonious, and the court instructed the jury that the state must "prove that the taking was intentionally done and that it was feloniously done, and these elements must be established * * * beyond a reasonable doubt."

Again the court instructed:

"* * * If you find beyond a reasonable doubt * * * that such taking was not by accident or mistake, but was with felonious intent and was willfully done, and that the animal was not seized under judicial process nor distrained for trespass, then the State would have made its case and you would be entitled to return a verdict of guilty."

Again the court instructed:

"Such unauthorized taking must be willful and felonious. 'Willful' means intentional and 'feloniously' means an act which is criminal and malignant."

It is clear that the indictment was drawn and that the trial proceeded upon the theory that guilty knowledge was a material element of the crime as defined by statute.

■ It is contended that the word "take," as employed in the statute, has no determinative meaning. We read from the appellant's brief: "* * * 'Take' may mean a physical taking by taking possession of an article, or it may mean taking something that is intangible such as to take lessons * * *." We think there is little danger that the statute will be applied to the taking of an intangible calf. The meaning of the word in its context is clear. It refers to the physical possession of an animal specified in the statute.

The defendant cites *State v. Park*, 42 Nev. 386, 178 P. 389. In that case a statute provided that it

should constitute a felony to have in possession the hide of any cow from which hide the ears had been removed or brand obliterated, etc. The statute was held unconstitutional. Speaking of the statute, the Nevada court said: "There are no exceptions made or guilty intent required. The owner and the thief are placed in the same class by possession of the proscribed hide." The act was stricken down as an invasion of property rights of owners. The statute in the case at bar is for the protection of those rights.

■ The defendant cites *State v. Diamond*, 27 N. M. 477, 202 P. 988, 20 A. L. R. 1527. In that case the court held unconstitutional a statute prohibiting the teaching or advocating of any act which had for its purpose the destruction of organized government or any act which is antagonistic to or in opposition to organized government. The statute was similar to the Oregon Criminal Syndicalism Act which was invalidated in *De Jonge v. Oregon*, 299 U. S. 353, 81 L. ed. 278, 57 S. Ct. 255. In both instances it was held that the statute involved an unconstitutional deprivation of the right of free speech. The New Mexico court also held the act invalid by reason of its uncertainty. We recognize that criminal statutes may be held void for indefiniteness but hold that the doctrine does not apply to the statute in the present case which, by the application of a simple rule of construction, can be made definite.

■ It is next said that the indictment is insufficient because it fails to state the manner and means of the alleged taking. The indictment follows the language of the statute. It informs the defendant that she is charged with taking into her possession without authority a calf described as to markings and ownership. Innocence

of purpose is negatived by the allegation that the act was done willfully and feloniously. As to the meaning of the word "willfully" under similar circumstances, see *Monnet v. Ullman*, 129 Or. 44, 276 P. 244, and *State v. Anthony*, supra. In the absence of any demurrer, the indictment was sufficient.

■ As the second assignment of error, the defendant earnestly contends that the court erred in receiving in evidence, over objection, "the iron or brand of Hill Brothers." Defendant asserts in support of this assignment that ownership of an animal cannot be proven by an unrecorded brand or by an unrecorded assignment of a brand, and that ownership of a brand cannot be proven by parol evidence.

The process by which the state attempted to prove that Lyle Hill owned the unbranded calf described in the indictment was as follows: (1) The introduction in evidence of a copy of the recorded brand of Hill Brothers, residing at Princeton, Harney County, Oregon; (2) oral evidence identifying Hill Brothers as being Lyle Hill and his brother, Lloyd; (3) oral evidence that the recorded brand owned by both brothers was used only upon cattle owned by Lyle Hill; (4) evidence that a certain cow bore the Hill Brothers brand; (5) evidence that the cow thus branded was the mother of the unbranded calf described in the indictment.

The statute provides:

"Any brand recorded in compliance with the requirements of this chapter shall be the property of the person, firm, association or corporation causing such record to be made and shall be subject to sale, assignment, transfer * * * as personal property. Instruments of writing evidencing the sale,

assignment or transfer of such brand * * * shall be recorded * * *. The recording of such instrument shall have the same force and effect as to third parties as the recording of instruments affecting real estate * * *." O. C. L. A. § 32-1117.

"* * * in any criminal proceedings when the title or right of possession is involved, the brand of any animal shall be prima facie evidence that the animal belongs to the owner or owners of the brand, and that such owner is entitled to the possession of the said animal at the time of the action; provided, that such brand has duly been recorded as provided by law. Proof of the right of any person to use such brand shall be made by a copy of the record of the same * * *. Parol evidence shall be inadmissible to prove the ownership of a brand." O. C. L. A. § 32-1119.

"No evidence of ownership of stock by brands shall be permitted in any court of this state unless the brand shall have been recorded as provided by sections 32-1111 to 32-1122 * * *." O. C. L. A. § 32-1120.

Under O. C. L. A. § 32-1117, supra, the so-called 50 bar brand, having been recorded by Hill Brothers, was their property. Under § 32-1119, supra, introduction in evidence of the recorded brand was proof of the right of the owner of the brand to use it.

Being a part owner of the brand, Lyle Hill required no assignment thereof to entitled him to use it. True, the brand was *prima facie* evidence that the branded animal belonged to both brothers, but it was not conclusive evidence. Lyle Hill was entitled to rely upon the recorded brand to prove ownership thereof and the right to its use, and, at the same time, he was at liberty to prove by oral evidence that the brand was used only by him and only on his cows. If Lyle Hill had rested his case merely on the recorded brand and

on the *prima facie* case that arose from it under the provisions of the statute, there would still have been no fatal variance from the allegation of the indictment that he was the owner.

■ In a larceny case, this court early held that

" 'When property is stolen which belongs to a partnership and it is alleged to belong to A., and the proof shows another is a partner or part owner with A. in said property, and it also appears that A., by the consent and agreement of the other partner or part owner, had the possession, control and management of the stolen property at the time of the larceny, such proof will sustain the allegation of the property in A.' " *State v. Wilson,* 6 Or. 428, 430.

■ Upon applying this principle to the case at bar, it appears that there would have been sufficient proof of a special ownership in Lyle Hill if he had proved joint ownership of the cow by relying upon the *prima facie* case made under the statute by the recordation of the brand and if he had followed up that proof with evidence of his possession, control and management of the cow, such possession being pursuant to agreement with his joint owner. The state did in fact prove by admissible parol evidence that, pursuant to agreement with his brother, Lyle had the exclusive control and management of the cows marked with the 50 bar brand.

■ Whether the state relied upon joint ownership of the brand, coupled with separate possession and control of the cow, or relied upon proof overcoming the *prima facie* evidence of joint ownership and establishing sole ownership of the cow, it would follow in either event that both the recorded brand and the parol evidence were admissible. Furthermore, under the rule

of *State. v. Christy,* 131 Or. 314, 282 P. 105, evidence that a cow was marked with a brand would have been admissible for identification purposes like any other mark upon an animal although it would not have been admissible to prove ownership unless the brand was recorded. It should be added that there was in this case evidence that Lyle Hill was the owner of the cow and calf, regardless of any legal inference from the recordation of the brand.

By the third assignment of error it is contended that the court erred in admitting the testimony of Lloyd Hill relative to conversations with Gabe Seeley, a ranch hand in the employment of the defendant. A brief review of the evidence is necessary to an understanding of this assignment. Several witnesses, including Lloyd Hill, had testified to the discovery in a hidden spot on the defendant's ranch of two calves tied to trees and with their mouths wired shut in such manner as to prevent them from bawling. One was tied with an iron chain. There was evidence that the calves were the offspring of two cows belonging to Lyle Hill which were found inside the fence on defendant's ranch but at a different location. The udders of the cows were swollen indicating that the calves had been separated from their mothers for a period of from 24 to 36 hours. When freed the calves went to and took nourishment from their putative mothers.

After the discovery of the calves and before their release the defendant, Hazel Opic, was seen driving rapidly to her ranch in a car. She immediately saddled a horse and rode at great speed to the gulch where the calves were confined and sought to turn them loose. She succeeded as to one but was forcibly prevented from releasing the other by Pat Bunyard, who, upon

discovery of the calves, had been posted nearby to observe events. Within a few moments others including Lloyd Hill, brother to Lyle Hill, arrived at the scene; and, after some physical and verbal encounters, the defendant departed.

Lloyd Hill testified that before the defendant left she said to him: "I heard in Crane that you was framing me here." It appears from the evidence that she had seen Gabe Seeley, her employee, and that he had informed her that the Hill brothers were in the vicinity of her ranch. The defendant as a witness made no claim of ownership or right of possession in the calves. She testified that she did not know anyone was on her ranch until she was riding to the point where the calves were tied. She testified that she saw and followed tracks leading to the place where the calves were tied, that she rode slowly and stopped to water her horse at the creek, and that she had no knowledge that the calves were there. She also said she thought that the tracks might have been made by a neighbor whom she wished to see. She testified that on finding the calves she attempted to release them so that she could drive them away from her place.

About an hour after defendant had left the place where the calves were tied, Gabe Seeley, the defendant's employee, arrived at the ranch. At that time Lloyd Hill and other witnesses were observing the conduct of the obviously reunited cows and their calves. Gabe Seeley rode into the field on horseback armed with a rifle displayed in a threatening manner.

On cross-examination by the defense Lloyd Hill was asked:

"Q You say you followed him up there?
"A Yes, sir.

"Q And did you have any conversation with him there at that time?

"A We did.

"Q And at that time you recollect the incident when you followed him up there and talked to him— did you say to him substantially, Mr. Hill: 'You take off over the hills, we don't want you?'

"A I did not.

"Q Did any member of your party make that statement?

"A They did not.

"Q And did you have any conversation with—?

"A We did."

On redirect examination by the state the following occurred:

"Q I wish you would give us the substance of the conversation between Mr. Seeley and yourself and any other member of that party on the occasion when you rode up into the field and saw him there with the rifle?

"MR. DONEGAN: Objected to for the reason that it is hearsay.

"THE COURT: The very subject counsel went into on Cross-Examination. Objection will be overruled.

"Q Then what was said, as nearly as you can recall it?

"A Well, when we got up to him he turned his horse around and he says 'Don't come a step further,' and we told him we wasn't going to hurt him we was—wait a minute till I get that—I says 'Gafe, you better wait and see what this is all about before you get too hasty'; and he kept telling us to stay back. We stopped our horses and I told him that— and then just about that time the calf came along that had been—that she turned loose.

"Q Was that the heifer calf?

"A The heifer calf. I said 'Gafe, look right there, there is what we was talking about, was the calf she had tied up.' It went right to its mother. He watched it sucking and he put his gun up and we talked a while—I can't remember just everything that was said—and went back to the house with us.

"Q Did any other member of the party make any statement to him?

"A They did.

"Q. What was that and who made it as nearly as you can recollect it?

"A Where?

"Q On that occasion there in the field.

"A I think it was Bud said 'Gafe, if you haven't got anything to do with this, you better put your gun up and reason things out, but if you have, you better get over the hill, if you are mixed up in it you are going to get yourself into trouble.' "

Gabe Seeley was examined by the defense concerning the same conversation as follows:

"Q Go ahead then and tell everything that happened and was said at that time.

"A Well, Bud walked up—I have known Bud for a long time and Bud says, 'Now, Gabe,' he says 'We don't want to have any trouble.' I says 'No, there has been enough trouble the way it looks to me, from the looks of Mrs. Opie's arm. There won't be any trouble any more.' And Bud spoke up, he says 'Now, if you are into anything here the best thing you can do is put your gun up and go over the hill.' * * *

"Q Did Lloyd Hill at any time during the day suggest to you that you leave the country?

"A He told me if I wasn't mixed up in anything the best thing I could do was to get over the hill."

Thereafter Bud Uto, a witness for the state, was asked -by the- prosecution concerning this same conversation. The defendant objected to the evidence as hearsay, and the state withdrew the question. The following testimony, similar to that given by Hill on redirect examination, was elicited from Uto by. the defendant after the defendant had objected to its introduction by the state:

"A Well, when we got up there he drew a gun on us, it was a 22 rifle as near as I could see, I think that is what it was—I never inspected the gun—but it looked like it. He turned his horse around and stuck it out like this at us and he told us to stop. Well, we did, and so we was speaking to him and telling him that he had better put that gun up, we didn't want no gun fight, there was going to be enough trouble around there without that. This calf came off the hill then that sucked this cow. Lloyd told him then 'Look there, Gay, that is what all this trouble is about. That is one we turned loose up there in the ravine,' and Gay put up his gun and was nice about it. We all went back to the house.
* * *

"A I told him there was going to be some trouble and if he was guilty he better get over the hill, if he was innocent, we wanted him to stick around.

"Q Did you also tell him that the Hills were not interested in him but they wanted to get Hazel Opie?

"A I did not.

"Q Did Lloyd Hill make that statement to him?

"A No, sir, not that I heard.

"Q Did Lloyd Hill also tell him he had better go over the hill?

"A I don't think Lloyd said that, no.

"Q But you did?

"A I think I was the one that said that."

██ It will be observed that the only question to which objection was made was propounded to Lloyd Hill on redirect examination and called for the substance of the conversation between the witness and Gabe Seeley. The state claims that this conversation was admissible under O. C. L. A. § 2-211, which provides that when part of a conversation is given in evidence by one party, the whole on the same subject may be inquired into by the other. The statute had no application to the proffered testimony. It is true that the defense did bring out the fact that there was a conversation and asked if a certain statement had been made, but the answer was in the negative and the matter was dropped. Since no part of the conversation was elicited by the defendant on cross-examination, the statute conferred no right upon the prosecution to produce evidence thereof. However, we think there was no prejudicial error in receiving the substance of the conversation. With a single exception, similar evidence was elicited by the defense, and it bore remotely, if at all, on the real issues of the case.

One small portion of the quoted conversation presents a closer question. We quote it again. Lloyd Hill testified: "I said 'Gafe, look right there, there is what we was talking about, was the calf she had tied up.' It went right to its mother."

It will be observed that the court reporter put his own construction on the testimony by the manner in which he punctuated it. In preparing the transcript he enclosed within quotation marks the words "the calf she had tied up." It is impossible for us and it was impossible for the reporter to know from the words spoken where the direct quotation ended. We think it unlikely that the witness in directly quoting his own former

words to Gabe Seeley intended to include within the
direct quotation "was the calf she had tied up." If the
witness was giving a direct quotation of his language
to Seeley, we think he would have said in substance
"there *is* the calf she tied up," not there *"was* the calf
she *had* tied up." We think the proper punctuation
inserted by the reporter should have been as follows:
"I said 'Gafe, look right there, there *is* what we was
talking about,' was the calf she had tied up." If such
be the proper understanding of the record, then there
was no hearsay testimony introduced to the effect that
she (the defendant) had tied up the calf. There was
only a statement by the witness before the jury that
she had tied up the calf, a statement to which no objec-
tion was made.

Since this conclusion may not be wholly free from
doubt, we are considering the situation on the assump-
tion that Lloyd Hill testified that in conversation with
Gabe Seeley, he, Hill, spoke of "the calf she had tied
up." If in fact Hill testified that he had stated out of
the presence of the defendant to Gabe Seeley that the
defendant tied up the calf, his testimony would have
been hearsay and would have borne upon an important
point in the case. Such an extrajudicial statement, if
received in evidence over objection, might ordinarily
be deemed to constitute reversible error. But here the
circumstances are unique.

■■■■ Hearsay evidence may be roughly defined as
testimony by a witness on the stand as to what another
unsworn person not a witness had said at an earlier
time and a different place. The reasons for excluding
hearsay evidence are clearly set forth by Professor
Wigmore. Such evidence is excluded because its ad-
mission would deprive the opposing party of the

valuable right of examining the declarant under oath and of the further right to confront the declarant as a witness. 5 Wigmore, Evidence § 1362 et seq. The party against whom such hearsay evidence is introduced ordinarily has no opportunity by cross-examination to determine the source of knowledge of the declarant, the accuracy of his memory or his credibility.

■ If in the case at bar we were to hold that the receiving of Lloyd Hill's testimony was prejudicial error, we would be applying the hearsay rule to a case in which none of the reasons which support that rule were present. The declarant, Lloyd Hill, who (we are assuming) told Gabe Seeley that the defendant tied up the calf, was the same Lloyd Hill who under oath and subject to cross-examination was confronted on the stand and who testified to his own prior hearsay statement. He was subject to thorough cross-examination which made it clear that he did not see the defendant tie up the calf and that his statement could have been nothing more than a conclusion. If Lloyd Hill as a witness in response to a general question had volunteered the information to the jury that the defendant tied up the calf, his statement would have been subject to be stricken on motion as a conclusion but would not have required reversal of the case in view of the cross-examination.

There is little difference in principle between the case where a witness testifying under oath says, ''I say she tied up the calf,'' and the case of a witness who testifies under oath, ''I said [to Gabe] she tied up the calf.''

We conclude that at the worst, and assuming that the reporter properly placed the quotation marks, there was a technical violation of the hearsay rule which

might properly have been stricken if a motion had been made, but it was a violation which deprived the defendant of no right which the hearsay rule is designed to protect, namely, the right to confront and cross examine the declarant under oath.

The next assignment of error relates to an impeaching question put to Gabe Seeley. By way of introduction it may be said there was evidence from which the jury might well have believed that Seeley as a witness was strongly prejudiced in favor of the defendant, his employer. On cross-examination the chain with which one of the calves was tied was exhibited to Seeley who testified that he had never seen it before. The following impeaching question was then propounded: .

"Q Mr. Seeley, on Friday evening at the close of court, in the court room, when were present Mr. Eldon Sitz, Deputy Sheriff, and yourself, did you not make this following statement, approximately, back of the first bench here, leading from the counsel table, in substance and effect as follows: 'When this is all over I want that chain back the calf was tied with, as I need it?'

"A Why, no, I didn't know anything about the chain the calf was tied up with. We got approximately 12 or 14 halter chains."

A proper foundation having been laid, Eldon Sitz, a deputy sheriff, was called by the state and testified as follows:

"Q Mr. Sitz, last Friday evening at the close of court did you have a conversation with Mr. Gabe Seeley?
"A I did.

"Q And did that conversation take place at approximately the entrance between the benches in the court room right behind the counsel table?
"A It did.

"Q Did you have in your possession at that time, and hand, State's exhibit number 8?

"A I did.

"Q At that time and place, on Friday evening at the close of court, at approximately the entrance between the benches back of the counsel table, when was present in conversation yourself and Mr. Gabe Seeley, in substance and effect did Mr. Seeley state: 'When this is all over I want that chain back the calf was tied with, as I need it,' or words to that effect?"

■ "An objection was interposed by the defendant "for the reason that the statement purported to be made by Seeley was not made in defendant's presence and is not binding on her." The objection was not appropriate and the testimony was admissible at least for impeachment purposes. The objection was overruled by the court who said: " * * * But the consideration of the jury of the testimony will be limited to the matter of the identification of the chain."

■ We think the testimony should have been received for the purposes of impeachment only, but the transcript fails to disclose any objection or exception to the ruling of the court which limited the evidence to the identification of the chain. To the impeaching question the witness answered, "Yes." No further objection was taken. The ruling of the court was in the nature of an instruction to the jury to which no exception was taken. If erroneous, the objection is not now before us. O. C. L. A. § 5-704, as amended by Laws 1941, Ch. 257.

Concerning both of the assignments of error which we have last discussed, counsel for the defendant contends that the evidence was prejudicial, but he also says in his brief:

"The * * * conversations referred to constitute hearsay evidence, and so far as we have been able

to find from the record are wholly unrelated to any issue involved or upon any material fact over which there was a controversy. For instance, the conversation between Gabe Seeley, or any statements that he might have made, or may have been made to him concerning the calf, would neither tend to prove or disprove any fact in the case.''

We hold that no prejudicial error occurred.

■ At the conclusion of the evidence, the defendant moved for a directed verdict upon grounds which we have already considered and further contended that there was no evidence that the calf had not been seized under judicial process or distrained for trespass. There was substantial evidence from which the jury could have inferred that the calf was neither taken under judicial process nor distrained for trespass. The motion for directed verdict was properly denied.

■ We have carefully considered the basis for defendant's contention that the court erred in refusing to receive evidence tending to show ill will between defendant and Hill brothers or tending to show that the defendant had been ''framed.'' The evidence which defendant contends was improperly excluded relates to an alleged conversation between Bud Uto and the defendant. While the defendant was on the stand testifying in her own behalf the following occurred:

''Q (By Mr. Donegan, direct) Was Bud Uto at your ranch during the month of May or June and did he have a conversation with you when a certain George Stafford was present, a conversation relating to your saddle horses?

''A Yes, sir.

''Q And at that time did you ask him why he turned your saddle horses out of section 11 and he told you that Lloyd—? * * *

''—And Uto told you that Lloyd told him to turn your saddle horses out and you asked him why he

didn't give you notice before he did so and he said that he had to turn the horses out, he was only working for wages.

"A That is his exact words.

"MR. HALLOCK: We object to the question as incompetent, no proper foundation being laid and the question not being couched in language required for an impeaching question.

"THE COURT: It is an attempt to impeach on a collateral matter. Objection will be sustained."

Uto was not an employee of Lyle Hill but of Lloyd. The matter was collateral, and the court did not err in holding it inadmissible. In any event the objection was not sustained until after the answer was given and there was no motion or order striking the testimony.

■ Defendant assigns as error the refusal of the court to permit Price Cochran, as a witness for the defendant, to testify that in their operations the Hill brothers were unreasonable in crowding their neighbors and had a bad reputation in the vicinity to that effect. The court did not err in rejecting the proffered testimony.

Again, while Mrs. Buel Johnson was on the stand testifying on behalf of the defendant, the following occurred:

"Q (BY MR. DONEGAN) Mrs. Johnson, do you have any knowledge of either Lyle or Lloyd Hill placing salt on your range?

"A Yes, sir.

"MR. HALLOCK: We object to that as irrelevant and immaterial.

"THE COURT: Objection will be sustained."

■ No offer of proof was made. The relations between the Hills and Mrs. Johnson were wholly ir-

relevant to the issue in the case, and the ruling of the court was correct.

It is on the basis of the foregoing exceptions that the defendant contends that the court improperly excluded evidence of ill will on the part of Hill brothers. We find no error in the rulings of the court on that issue.

Defendant contends that the court erred in giving the following instruction:

"16. I instruct you that in this State a malicious and guilty intent is conclusively presumed from the deliberate commission of an unlawful act for the purpose of injuring another. This presumption may not be overcome by other evidence because it is, as I have defined to you, a conclusive presumption. You must, however, before that presumption arises, be convinced beyond a reasonable doubt that the unlawful act charged was deliberately committed by the one charged. The law also presumes that an unlawful act was done with an unlawful intent and that the person intends the ordinary consequences of the person's voluntary act. This is a disputable presumption, however, and may be controverted and overcome by other evidence."

To this instruction the following exception was taken:

"Defendant objects to instruction number 16 * * * the point being that the defendant contends such instruction is not applicable to the crimes of the nature charged in this indictment. It involves rather an indictment which could charge an injury to person rather than a property injury."

While the instruction concerning the conclusive presumption is seldom if ever given except in homicide cases and might well have been omitted, the statute certainly is not limited in its application to cases in-

volving physical injury of the person. If for the purpose of injuring Lyle Hill the defendant willfully and feloniously took the calf as alleged in the indictment, the statutory presumption of a malicious and guilty intent would arise. The instruction was not erroneous.

We have carefully examined the few remaining assignments of error and find that they are without merit. The defendant was seriously discredited by her admitted previous conviction for cattle stealing. She had a fair trial. The judgment of conviction is affirmed.